CONTINENTAL INSURANCE COMPANY *v.* KOUWENHOVEN, ET UX.

[No. 110, September Term, 1965.]

116

*Decided March 31, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

*George M. Radcliffe,* with whom was *W. Edgar Porter* on the brief, for appellant.

*John W. T. Webb* and *D. William Simpson,* with whom were *Webb & Travers* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The appellees, Henry B. Kouwenhoven and his wife Clara F.

Kouwenhoven, as the plaintiffs below (the Kouwenhovens), sued the appellant and defendant below, the Continental Insurance Company (the Insurance Company) in the Circuit Court for Worcester County to recover losses under a Homeowner's Policy issued by the Insurance Company to the Kouwenhovens. The action was removed to the Circuit Court for Wicomico County and was tried by a jury which rendered a verdict for $3500.00 in favor of the Kouwenhovens. From a judgment entered upon this verdict, the Insurance Company appeals. The Kouwenhovens filed no cross-appeal.

The Kouwenhovens owned and occupied a house in Worcester County on the western or mainland side of the Chincoteague Bay at a point called Figgs Landing, which is approximately one and one-half miles south of Public Landing. At that point, the Chincoteague Bay is a relatively shallow body of water between four and five miles in width and is separated from the Atlantic Ocean by a barrier reef called Assateague Island.

The Kouwenhoven dwelling faces east toward the Bay and consisted of two distinct structures connected by a narrower and lower structure. The structure on the south is referred to as the main house; the structure to the north is referred to as the guest house; and, the connecting structure is referred to as the sun porch. Extending out from the front of the property into the Bay was a pier or dock, on the eastern end of which was a bath-house. To the west of the dwelling were two other structures, a tool house approximately 100 feet away and directly to the west and a garage about 90 feet away to the northwest of the dwelling. There was a lawn between the Bay and the dwelling which was approximately 400 feet from the normal high-water line. The dwelling contained the usual household furniture and effects.

The policy at the time of the losses on March 6 and 7, 1962 had the following limits of liability: Under Section I-A, Dwelling, $25,000.00; B. Appurtenant Private Structures, $4,500.00; C. Unscheduled Personal Property, $10,000.00; D. Additional Living Expense, $5,000.00; Under Section II-E. Comprehensive Personal Liability-Each Occurrence, $25,000.00; and, F. Medical Payments-Each Person, $500.00. The annual premium was in excess of $400.00.

The policy provided in relevant part, as follows:
"PERILS INSURED AGAINST. This policy with respect to Coverages A and B under Section I insures against all risks of physical loss (and under Coverage D, additional living expense resulting from such loss), except as hereinafter excluded."

Under the heading "Extensions of Coverage" appeared:

"2. *Debris Removal*: This policy covers expenses incurred in the removal of the property covered hereunder occasioned by loss thereto for which coverage is afforded."

Under the heading "SPECIAL EXCLUSIONS", it was provided:

*"This policy does not insure against loss:*
* * *

"(c) caused by, resulting from, contributed to or aggravated by any of the following:

(1) flood, surface water, waves, tidal water or tidal wave, overflow of streams of other bodies of water, or spray from any of the foregoing, all whether driven by wind or not."

Under "Coverage C-Unscheduled Personal Property", and the heading "PERILS INSURED AGAINST", the policy stated:

"This policy insures under Section I against direct loss to the property covered (and additional living expense resulting from such loss or loss to the building containing the property covered) by the following perils as defined and limited herein * * *."

"3. Windstorm or hail, excluding:
* * *

"(b) loss to the interior of the building or the property covered therein caused by rain, snow, sand or dust, all whether driven by wind or not, unless the building(s) covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct force of wind or hail and then this

Company shall be liable for loss to interior of the building(s) or the property covered therein as may be caused by rain, snow, sand or dust entering the building(s) through openings in the roof or walls made by direct action of wind or hail."

The storm, which caused the losses claimed by the Kouwenhovens (and which is referred to in the testimony as the "Storm of the Century"), began on the evening of Tuesday, March 6, 1962 as a small northeaster. It gradually increased in intensity. The Kouwenhovens had been to a Shrove Tuesday church supper and returned home about 7:00 to 7:30 P.M. When they returned, it was raining and the wind was blowing so hard that Mr. Kouwenhoven had to hold his wife's arm to keep her from being blown off the walk. The water in the Bay at that time was rough, but there was then no exceptionally high tide. Julia Figgs, who lives in the house adjoining the Kouwenhoven property to the north, was at home with her son Alan on the evening of March 6. She testified that the "wind gradually got worse and worse and worse and worse all night long." She watched the dock of the Kouwenhovens until approximately 9:30 to 9:45 P.M. She looked away while the bath-house was still intact but when she looked back a short time later, it had disappeared. At that time, the water level of the Bay was about up to the floorboards. She telephoned Mr. Kouwenhoven about 10:00 P.M. and told him that the bath-house was gone.

From then on the storm increased in intensity. Mrs. Figgs testified that her house shook. Mr. Kouwenhoven heard his screens rip shortly after 10:00 P.M. He could hear the bushes thrashing back and forth against the shingles with which the dwelling is covered.

On the morning of Wednesday, March 7, Mr. Kouwenhoven saw that the water from the Bay was just beginning to come over the bank and on to his lawn. He could not see the end of his dock because of the rain, but the decking, and a railing which extended along the side of the dock, were still in place as far as he could see.

After eating breakfast, Mr. and Mrs. Kouwenhoven decided to leave the property. Mr. Kouwenhoven locked all the doors

and then attempted to carry his wife on his back to his automobile, but the wind was so strong, he could not move. He and Alan Figgs, who had come to their assistance, then placed Mrs. Kouwenhoven on a section of siding of decking of the pier, approximately 4 x 8 feet (or 6 x 9 feet) which had swirled around the corner of the dwelling in a "whirlpool", and floated Mrs. Kouwenhoven some 90 feet to the automobile. At that time the water was approximately knee-deep and the waves were approximately one to two feet high. Shortly thereafter, Mrs. Figgs and her son, Alan, left their property, but experienced some difficulty because the water was up to the floorboards of her automobile with seaweed in front of the car. Later at about 1:00 P.M. Julia Figgs, George Figgs and Alan Figgs attempted to return to their property to get some clothes. At that time the wind was blowing so hard that they could not walk from the automobile to the house. At about 4:00 P.M. that same day they returned with a tractor and were able to get into their house so that they could obtain some clothing.

The following day, Thursday, March 8, George Figgs returned to his property and entered the Kouwenhoven dwelling at that time. He discovered that the east front door of the main house had been forced open. The two panels on either side of the front door had been forced down with the outside facing up. Almost all of the panels and doors on the east side of the sun porch between the main house and the guest house had been forced in and were lying on the floor, with the outside facing up. A substantial part of the sun porch floor had collapsed. In the southeast bedroom of the guest house, a window had been forced open, and a hole had been made in the wall beneath the window. One or more cement blocks in the foundation had been forced back under the room. Most of the furniture in the living room and dining room area had been moved back to the westernmost part of the room. None of the windows or doors in the western portion of the dwelling had been forced open.

The Kouwenhovens returned to their property on Friday, March 9. The damage to the property was extensive. Mr. Kouwenhoven described it as a "scene of devastation." Every building and much of its contents were damaged.

The major part of the damage to the dwelling was confined to the living room-dining room area of the main house, the sun porch and the southeast bedroom of the guest house. Mr. Kouwenhoven, in describing the damage in these areas, stated that it was "Damaged to a focal point here, almost like a cyclone had ducked in this part—acted as though everything had been churned in together." He contrasted the damage in these areas with the much lighter damage in those areas where there had been no opening to the wind and also with the relatively small loss in the 1933 hurricane when there were no openings to the wind.

Mr. Kouwenhoven also observed that the screening on the front porch had been torn and the door leading from the porch to the main house had been forced in. The panels on both sides of the front door had been forced in from the top and fell with the outside facing up. He observed that one of the panels was still attached to its frame at the bottom of the panel. The panels on the east side of the sun porch facing the Bay, had also been forced in from the top and also fell with the outside facing up. The door leading from the sun porch to the dining room had been broken off its hinges and a window in the southeast bedroom of the guest house had been broken in.

In the rooms where openings were made, the furniture and other household effects were severely damaged. Chairs and other pieces of furniture were broken up and scattered, a double couch was shattered and heavy furniture, including a secretary filled with books, was moved about and broken. In addition to these damages the tool house was forced off its foundation and was pushed over on its back. The main door of the garage was forced open and the lock and frame were broken. The furniture inside the garage (which had been fixed up as living quarters) was thrown about and damaged. As has been indicated, the bath-house was entirely destroyed. Mr. Kouwenhoven testified as to each item that was damaged, the type of damage to the various structures as well as to the various items of personal property, the nature of the damage, and the amounts of loss. In the Amended Bill of Particulars filed May 18, 1964, the Kouwenhovens itemized 56 items of loss amounting in the aggregate to $8,034.70.

The trial court, over the objection of the Insurance Company, permitted Mr. Kouwenhoven to give his opinion as an expert witness that the cause of the various losses claimed by the Kouwenhovens were caused by wind. More of the facts in regard to this alleged error will be stated when it is considered.

The Insurance Company produced Dr. Herman Newstein, an eminent authority in meteorology and physics, to give the general characteristics of the storm of March 6-7 as well as comparative data in regard to the winds, both sustained and gust, occurring during Hurricane Donna in September 1960. The data indicated that from the synoptic charts the maximum sustained wind velocity in Hurricane Donna on September 12, 1960 at Public Landing was 89 miles per hour. On the morning of March 7, 1962 the maximum sustained wind velocity was 56 miles per hour. The wind velocity for gusts was substantially higher. For example, at Salisbury during Donna the maximum sustained wind was 58 miles per hour, but gusts reached 83 miles per hour. At Public Landing during the storm of March 6-7, 1962, the maximum sustained wind was 56 miles per hour, as indicated, with a maximum gust speed of approximately 70 miles per hour. His testimony based on various hypotheses tended to indicate that the panels found with the outside facing up were forced out by water and waves rather than by wind.

In the declaration filed by the Kouwenhovens they describe the hazard insured against by the policy issued by the Insurance Company to them as "direct loss as the result of windstorm, excluding, however, loss as a result of flood, surface water, waves, tidal water, or tidal waves, overflow of streams or other bodies of water, or spray from the foregoing, all whether driven by wind or not" and then described the damages caused by the high winds which began to blow on March 6. There was no motion made to amend the declaration either during or at the end of the trial. The Insurance Company pleaded the general issue pleas in *assumpsit,* but no special plea. The trial judge in a comprehensive and carefully considered charge to the jury presented the case to the jury on the theory that the Kouwenhovens, as the plaintiffs, had the burden of proving by the preponderance of the evidence that the losses claimed for the dwelling and appurtenant structures were caused by windstorm and

that to recover for the losses claimed for damages to personal property within the structures the plaintiffs must first establish that the direct force of the wind caused actual damage to the roof or walls of the structures and then any damage by wind or water entering through the openings thus made. He confined recovery for the losses to damages thus caused, substantially adopting in this regard, the requests for instructions by the Insurance Company. The court's instructions to the jury setting forth the measure of damages were properly given. The Kouwenhovens excepted to the court's charge in regard to burden of proof in establishing the losses to the buildings on the theory that the policy as an "all-risks" policy only required the insured to prove damage to the property covered by the policy after which the burden of proof—or at least of coming forward with evidence—shifted to the Insurance Company to show that the loss came within one of the exceptions. The Insurance Company only filed exceptions to the trial court's charge on the theory that there was no legally sufficient evidence which would entitle the Kouwenhovens, as plaintiffs, to recover, there allegedly being no evidence legally sufficient to show that any damage was caused directly by windstorm or that any building involved, sustained any actual damage to roof or walls by the direct force of wind. As we have indicated the jury found a verdict for the Kouwenhovens for $3,500.00 and from the judgment entered on this verdict, this appeal was timely taken.

We are of the opinion that there are only two questions before us on this appeal. They are:

I. Did the trial court commit reversible error in permitting Mr. Kouwenhoven to give opinion testimony?

II. Was there any legally sufficient evidence to justify the submission of the case by the trial court to the jury?

The only exceptions preserved by the Insurance Company and presented by it in its brief, are those mentioned. There was no exception to the trial court's charge in regard to the measure of damages and the Insurance Company does not challenge the *amount* of the verdict. Counsel for the Kouwenhovens earnestly argued that under the all-risk policy, the burden of proof of showing that the damages were caused by wind alone was on the Insurance Company. This position, however, is contrary

to the one alleged in their unamended declaration. The issues were framed upon the theory that the plaintiffs had the burden of proving this cause for their damages, the case was tried on that theory and the trial court submitted the case to the jury on that theory. The Kouwenhovens filed no cross-appeal.

If we assume, *arguendo,* that this interesting issue of burden of proof is before us, we do not find it necessary to decide it, as we are of the opinion that even assuming for the argument that the burden of proof of establishing the cause of injury was by wind was upon the plaintiffs, there was sufficient evidence to justify the submission of the case to the jury by the trial court and to support the jury's verdict in this case.

## I.

Mr. Kouwenhoven, prior to his retirement in February 1961, had been a real estate broker engaged in real estate management for 22 years. During this time he had had extensive experience with buildings and storm losses. He testified:

> "Well, as manager of Garden Bay Manor, we had occasion to go through three different hurricanes and I am thoroughly familiar with the damage caused by hurricanes. We had 700 panes of glass blown out, roof damaged, doors damaged—about every kind of damage you could mention."

After testifying that he had not previously had hurricane or storm losses to his own property, he testified to a number of properties in which such damage had occurred. These were properties on Long Island, "through the Hamptons; and also in Bayside where we used to live." Bayside is on the north shore of Long Island. He testified in substantial detail in regard to the physical conditions when he left the Kouwenhoven property after breakfast on March 7 and upon his return to that property on the morning of March 9. He described in detail the damage to the screen of the sun porch, the door which he found open, the doorjamb which had been shattered and the panelings which had been moved out of their original places. One panel was lying on the floor with the bottom still attached to its frame; the others had been moved into the room. The side which faced the water on the outside was up. The door

leading from the dining room to the sun porch was broken off its hinges. The most southerly window was broken in the bedroom at the southeast corner of the guest house, and substantial damage occurred in that bedroom. He stated, as we have heretofore indicated, that this area was "Damaged to a focal point here, almost like a cyclone had ducked in this part —acted as though everything had been churned in together."

He called attention to his examination of the paint on the main house indicating that it began to peel after the storm and continued to peel, while the guest house, painted with the same type of paint at the same time by the same labor in 1961, did not peel. This indicated to him that there "was more of a cyclonic effect all the way around the [main] house." The dwelling had been through the hurricane of 1933 when the Ocean City inlet had been cut through, but the damage from that hurricane "amounted to about one-tenth of what this storm did" because "there was no opening made by anything but the water coming into the house at that particular time—everything remained tight and closed." [1]

In regard to the cause of the damage, the trial court stated "we think it is borderline. However, for whatever it may be worth we will let him answer the question and overrule the objection." The answer was:

> "Judging by the physcial evidence of the damaged doors and panels my opinion of the damage is that it was caused by the action of the wind blowing these panels in and blowing the doors in. From the position of the doors and the panels it was evident to me that it could only be wind damage, because if water had caused the damage the doors would have been laid down directly opposite to the way they were laid."

He also stated that he claimed wind damage "because of the

---

1. It is interesting to note that the hurricane of 1933 (August 23, 1933) was considered by the Court in National Fire Insurance Co. v. Albers, 167 Md. 599, 175 Atl. 597 (1934) and recovery for wind damage was sustained although the wind velocity of that storm at Miller's Island in the Chesapeake Bay was only 50 miles per hour.

physical condition of the property as I looked in—the lamps strewn and thrown all around. The shades were broken. They had to be destroyed. * * * the lamps were overturned."

Questions arising in the trial of a case in regard to the qualification of an expert witness are largely within the discretion of the trial court. As Judge (now Chief Judge) Prescott stated for the Court in *State, use of Stickley v. Critzer,* 230 Md. 286, 289-290, 186 A. 2d 586, 588 (1962) :

> "* * * [T]he questions of the qualifications of an expert and whether or not his opinion will help the trier of facts appreciably are largely in the discretion of the trial court."

See Note 1 in *State, use of Stickley v. Critzer, supra* citing the prior Maryland cases. See also *State Roads Commission v. Creswell,* 235 Md. 220, 226, 201 A. 2d 328, 331 (1964) and *Turner v. State Roads Commission,* 213 Md. 428, 433, 132 A. 2d 455, 457 (1957).

The determination by the trial court of the experiential qualifications of a witness will only be disturbed on appeal if there has been a clear showing of abuse of the trial court's discretion.[2] *Turner v. State Roads Commission, supra.*

Professor Wigmore, after explaining the difficulties attendant upon the use of the term "expert" as applied to witnesses —as all witnesses are "expert" to some degree—divides expert capacity into two general classes, i.e., (1) the kind of skill in the ordinary use of the senses which every mature member of society has and for which no express preliminary evidence of the possession of skill in these matters is necessary; and, (2) that class of matters as to which it is only by means of some special and peculiar experience, more than is the common possession, that a person becomes competent to acquire knowledge in regard to which the possession of such experience cannot be

---

2. Professor Wigmore is of the opinion that this rule is too restrictive and that there should be no review on appeal whatever from the determination of the trial court on this issue. See 2 Wigmore on Evidence (3rd ed.) §561, page 643. The Maryland cases do not go this far, but the trend of the cases generally throughout the United States appears to be moving in this direction.

assumed but which, as to the particular witness, must be shown beforehand. He further subdivides class 2 into two further classifications, i.e., (a) *Occupational experience*—the kind obtained casually and incidently, yet steadily and adequately, in the course of some livelihood or occupation; and, (b) *scientific experience,* the kind acquired by a systematic training directed deliberately to the acquisition of fitness and involving the study of a body of knowledge forming a branch of a science or art. See 2 *Wigmore on Evidence* (3rd ed.) §556, page 635.

In our opinion, in the case at bar, the trial court did not clearly abuse its discretion in determining that Mr. Kouwenhoven came within class 2(a). By virtue of Mr. Kouwenhoven's long experience of 22 years in the real estate management business on Long Island and his actual experience with three hurricanes and the damage resulting from them from wind, as well as water, would justify the trial court's conclusion that he was qualified to give an opinion that certain items of damage were caused by the action of the wind and not by water.

Even though Mr. Kouwenhoven was not present when the specific damage occurred, he was present shortly before it occurred and not long after it had occurred and viewed the physical conditions which then existed. He gave the facts upon which he based his opinion, together with a comparison of the situation at his property with his experiences in prior hurricanes. This was sufficient to make his opinion of some value to the jury. The weight to be given his opinion was, of course, for the jury, which by its verdict of $3500.00 from a total claim of $8,034.70, apparently made a careful and discriminating evaluation of that testimony as well as the other evidence in the case.

## II.

Even apart from Mr. Kouwenhoven's opinion evidence, there was sufficient evidence to justify the submission of the case by the trial court to the jury.

We must consider the evidence, and all reasonable inferences to be drawn from that evidence, in the light most favorable to the Kouwenhovens inasmuch as the Insurance Company sought a directed verdict against them, and later, a judgment *non obstante veredicto. Safeway Stores, Inc. v. Bolton,* 229 Md. 321, 326, 182 A. 2d 828, 830 (1962).

There is no question that there was a very high wind of a maximum sustained velocity of 56 miles per hour with a maximum gust speed of approximately 70 miles per hour. We have already described its intensity at the site of the property, the forcing in of the panels on the side of the door on the east side of the main house, the damage on the east side of the sun porch and the forcing in of the window in the southeast bedroom of the guest house. None of the doors or windows on the west side of the buildings was forced in. The way in which the panels fell could suggest that they were forced in by the wind alone and the location of lamps and other chattels after the storm could suggest that wind alone forced the openings into the property. The jury could have concluded that the bath-house was destroyed by the action of the wind. This evidence and the inferences from the evidence were sufficient, if accepted by the jury, to support a recovery by the Kouwenhovens.

As our predecessors stated in *National Fire Insurance Co. v. Albers,* 167 Md. 599, 602, 175 Atl. 597, 599 (1934), a somewhat similar case involving a wind of 50 miles per hour at Miller's Island and an insurance policy insuring the insured against "direct loss and damage by windstorm, cyclone and tornado":

> "The question was one of fact to be determined upon a consideration of all the circumstances proved. In our opinion, the evidence admitted of a legitimate inference favorable to the plaintiff's right of recovery."

See also *Royal Insurance Co. v. Martinolich,* 179 F. 2d 704 (5th Cir. 1950); *Home Insurance Co. v. Sherrill,* 174 F. 2d 945 (5th Cir. 1949); *Murphy v. Insurance Co. of North America,* 355 Pa. 442, 50 A. 2d 217 (1947); *Stephens v. Cotton States Mutual Insurance Co.,* 104 Ga. App. 431, 121 S. E. 2d 838 (1961).

In our opinion, the facts in this case and the inferences to be drawn from the evidence, distinguish it from *Newark Trust Co. v. Agricultural Insurance Co.,* 237 Fed. 788 (3rd Cir. 1916); *National Fire Insurance Co. v. Crutchfield,* 160 Ky. 802, 170 S. W. 187 (1914) and *Fire Insurance Exchange v.*

*Paulson,* 381 S. W. 2d 199 (Tex. Civ. App. 1964), relied on by the Insurance Company.

*Judgment affirmed, the costs to be paid by the appellant.*