NIZER, ET AL. *v.* PHELPS, ET AL. Comm. for Marion
F. Phelps, Incompetent

[No. 387, September Term, 1967.]

*Decided January 21, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SMITH, JJ.

*Benjamin C. Howard,* with whom was *Robert L. Karwacki* on the brief, for appellants.

*Everett L. Buckmaster,* with whom were *George W. White, Jr., Samuel D. Hill* and *Buckmaster, White, Mindel & Clarke* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

Raymond G. Nizer, a bus operator, and his employer, The Baltimore Transit Company (Nizer and Baltimore Transit), defendants below, appealed from a judgment for $115,000 in favor of the appellees, Francis H. Phelps, Jr. and Charles E. Phelps, Committee for Marion F. Phelps, Incompetent (Mrs. Phelps), plaintiffs below, against the defendants upon the verdict of a jury in the Circuit Court for Baltimore County (PROCTOR, J.) for damages for serious injuries sustained by Mrs. Phelps when she was struck by a shuttle bus of Baltimore Transit at Howard and Preston Streets, Baltimore, Maryland on June 16, 1966.

On the day of the accident, Mrs. Phelps, then 82 years of age, left her home in Baltimore at 135 West Lanvale Street to go downtown to Hutzler's Department Store located on the west side of Howard Street at Saratoga Street. It was her habit to walk down Howard Street practically every day to have lunch at Hutzler's.

Howard Street runs north and south at Preston. It is a two-way street with a painted double line in the center. It is 54 feet wide with three lanes each for northbound and southbound traffic, each lane separated by broken lines. Preston Street runs east and west. It is a one-way street going west with a broken painted line in the center. Preston Street, at its intersection with the west side of Howard Street, is 60 feet wide from curb to curb through the center of the crosswalk and then narrows to a distance of approximately 39 feet. Preston Street is crowned in the center and slopes from the center to the north and south side of the street, respectively. There is a slight downgrade to the east. The marked pedestrians' crosswalk of Preston Street from the northwest corner to the southwest corner of the intersection is 14 feet wide at the north and somewhat wider at the south end.

On the northwest corner of Howard and Preston Streets is

the Fifth Regiment Armory, the steps of which protrude on to the sidewalk in such a way that a person walking south on the west sidewalk of Howard Street would walk right into the crosswalk.

As Mrs. Phelps was walking across Preston Street on June 16, 1966 at about 12:05 p.m. she was struck and seriously injured by a Baltimore Transit shuttle bus operated by Nizer. Traffic at the crossing was not controlled by either a traffic control device or by a traffic officer. The bus was northbound on Howard Street and was making a left turn across southbound traffic to go west on Preston Street. Traffic in the three southbound lanes on Howard Street was heavy and most of the traffic in the westernmost southbound lane was turning right to go west on Preston Street. The weather was clear and the streets were dry.

Mrs. Phelps, at the time of trial, was confined to a nursing home. She was totally disabled and mentally incompetent as a direct result of her injuries and will require nursing home care for the rest of her life. Because of her mental condition she was not able to testify. Police Officer Robert J. Rogers, however, reached the scene of the accident shortly after it occurred and before the ambulance arrived. Officer Rogers was qualified by training and experience in the investigation of accidents, having been assigned to the Accident Investigation Division of the Baltimore City Police Department for 14 years and having handled between 35 and 50 accidents in traffic court per month. During his 14 years with the Accident Investigation Division he had handled between 5000 and 8000 accident cases. He had attended the police academy, was trained in the investigation of accidents by his superior officers, at the time of trial he was himself training new men, and had read and studied various pamphlets and books on the subject of investigation of accidents. He had testified in both the Federal and State courts concerning points of impact and how they are established. After having been cross-examined in regard to his qualifications to give expert testimony on the point of impact, his testimony as an expert was permitted by the trial court.

Nizer testified that the bus had not been moved when Officer Rogers arrived at the scene of the accident. Officer Rogers im-

mediately began his investigation. He ascertained and marked the location of the physical evidence with yellow chalk to preserve its location, took photographs and talked to Nizer. The chalk marks do not appear on the photographs but Officer Rogers testified that this may have been because yellow chalk marks on an asphalt surface often do not show up in black and white photographs. Officer Rogers' testimony in regard to the physical evidence at the scene of the accident was recorded on his diagram (plaintiffs' Exhibit No. 5), and was shown on a plat (plaintiffs' Exhibit No. 4) and on two photographs (plaintiffs' Exhibits Nos. 1 and 2).

Officer Rogers' testimony and the exhibits mentioned indicate that immediately after the accident, the bus was south of the center of Preston Street. Its front was in the crosswalk about in the center of Preston Street headed on an angle in a northwesterly direction. Its position was such as to indicate that it "cut the corner" in making the left turn. Both front wheels were in the marked pedestrians' walkway, the left front wheel being close to the western line of the crosswalk, the right front wheel farther east from that western line. There was flesh in the blood trail that was on the street and there was flesh and blood on the left front wheel of the bus. Indeed, plaintiffs' Exhibit No. 1, the photograph showing the front of the bus, the location of its front wheels and showing the blood trail, indicates that the left front wheel was in part of the trail of blood. The blood was thick and heavy and, as indicated, had flesh in it. The blood trail was 11 feet overall. It began nine feet from the easternmost line of the crosswalk, and extended to the larger blood spot where Mrs. Phelps was lying.

Mrs. Phelps was lying in front of the bus just south of the center of Preston Street. Her head was two feet west of the west line of the crosswalk and her feet were six feet west of it in a blood spot. Her left leg was broken open, the flesh was torn loose and there was blood at the back of her head. Nizer testified that her leg was near the left front wheel of the bus and suggested that this wheel could have pinched her leg.

Nizer was called as an adverse witness by the plaintiffs. He was the only eyewitness to the accident that testified at the trial of the case. As will be later observed, his testimony at the

trial was in conflict with his deposition testimony and with certain statements which Officer Rogers testified Nizer had made to him at the scene of the accident.

At the trial, Nizer testified that he was northbound on Howard Street and was making a left turn to go west on Preston Street. When he saw Mrs. Phelps standing on the north sidewalk of Preston Street about ten feet west of the west line of the marked crosswalk, he glanced to his left and then to his right and saw her come from between a car or cab that was southbound on Howard Street making a right turn into Preston Street. Nizer said he was watching the automobiles as he was making his turn; that he saw Mrs. Phelps standing on the sidewalk and did not see her again until she was almost in the path of his bus. When he saw her the second time, she was almost in the center of Preston Street about two or three feet in front of him. He said that he was going approximately five miles an hour and that the first time he saw Mrs. Phelps with her hand up, was when he hit her. He stated that he "hit the brakes" when Mrs. Phelps came in front of him; that she was three to five feet west of the crosswalk when he struck her; and that he went a few feet farther before stopping, but that he could not say whether or not he had dragged Mrs. Phelps.

Nizer admitted at the trial that he had stated under oath in his deposition three times that Mrs. Phelps was in the crosswalk when he saw her. He also admitted in his deposition that he could not swear that he ever saw Mrs. Phelps before he saw her in front of the bus with her hand up. When he was questioned in regard to the conflict in his testimony at the trial and his testimony when his deposition was taken, Nizer (referring to his testimony on his deposition) stated that it was not exactly the truth and "I guess it is false as I saw her standing on the sidewalk before I made the turn."

Nizer admitted that he never told Officer Rogers that he saw Mrs. Phelps standing on the north side of Preston Street, nor did he say anything in his Answers to Interrogatories in regard to seeing her on the north side of Preston Street, ten feet west of the crosswalk. He further admitted that he had given Baltimore Transit three statements in regard to the accident and that in the first two statements he had said nothing

about seeing Mrs. Phelps on the sidewalk. It was not until approximately one month prior to trial, that Nizer decided that he had seen Mrs. Phelps standing on the north sidewalk of Preston Street and gave Baltimore Transit a statement to that effect.

The medical testimony in regard to Mrs. Phelps' physical injuries indicated that she had suffered a fracture of the left maxilla (the cheek bone), an injury to her left eye, a fracture to her right ankle and a compound fracture of the terminal phalanges of the second and third toe, with a questionable fracture of the second metatarsal bone on the right leg and a severe laceration of the lower left leg. The hanging skin was sewed back to the other skin of the lower left leg. Because of the loss of blood supply two toes and the sutured tissue became gangrenous and were required to be amputated. The skin removed from the lower left leg was replaced by skin grafts from Mrs. Phelps' thigh. She has only "a trace of her ankle" and will not be able to walk again. In addition, she suffered either a concussion or a subdural hematoma, and her mental condition is one of permanent confusion and disorientation.

Nizer and Baltimore Transit made motions for a directed verdict at the end of the plaintiffs' case and at the end of the entire case. After the verdict of the jury against them both, they made motions for judgments *n.o.v.*, or in the alternative, for a new trial, which were overruled by the trial court. From a judgment against them, entered on the verdict, the present appeal was timely taken. Additional facts will be stated when the various points raised on this appeal are later considered.

Nizer and Baltimore Transit urge upon us that the trial court erred as follows:

1. In permitting Officer Rogers to express an expert opinion on the question of the point of impact (a) as he was not qualified as an expert witness, (b) no expert opinion on the subject was necessary as the jury was competent to draw its own inferences from the facts without the need for expert testimony, and (c) his opinion was not sufficiently supported by the alleged facts on which he relied.

2. In characterizing Officer Rogers' opinion as that of an expert in the trial court's charge to the jury.

3. In permitting the jury to "view" Mrs. Phelps at the nursing home.

4. In refusing to instruct the jury on their theory of the case.

5. In failing to direct a verdict in their favor because (a) there was no legally sufficient evidence of primary negligence to submit to the jury, and (b) the evidence showed that Mrs. Phelps was guilty of contributory negligence as a matter of law.

In our opinion the trial court committed no reversible error and the judgment will be affirmed.

### 1 (a)

The appellants earnestly contend that the trial court erred in permitting Officer Rogers to express an opinion upon the point of impact as he was not qualified as an expert witness. We do not agree.

It is well established that it is in the sound discretion of the trial court to determine whether or not a witness is competent to testify as an expert. The trial court's determination in this regard will only be disturbed on appeal if there has been a clear showing of an abuse of its discretion. *Continental Insurance Co. v. Kouwenhoven,* 242 Md. 115, 126-27, 218 A. 2d 11, 17-18 (1966).

In *Acme Poultry Corp. v. Melville,* 188 Md. 365, 53 A. 2d 1 (1947)—a case involving an opinion by a State Police Officer that tires of the vehicles in question would leave marks if they were pushed sideways—Judge (later Chief Judge) Henderson for the Court, stated:

> "We also think that the State Police officer was sufficiently qualified to express an opinion that the tires of the vehicles would leave marks if they were pushed sideways. The investigation of motor vehicle accidents is one of the principal duties of the State Police. In any event, the determination of the qualifications of an expert must be left largely to the judgment of the trial court. *Bresnan v. Weaver,* 151 Md. 375, 380, 135 A. 584." (188 Md. at 373-74, 53 A. 2d at 4-5)

As we have already indicated, Officer Rogers had been as-

signed to the Accident Investigation Division of the Baltimore City Police Department for 14 years. A primary obligation of this Division is to investigate motor vehicle accidents. He had during his 14 years of service in the Division, investigated between 5000 and 8000 motor vehicle accidents. He had received training in investigation of motor vehicle accidents by his senior officers, had read books and pamphlets on the subject and, at the time of the trial, was himself instructing the newer men in the Division in regard to the investigation of such accidents. He had been qualified and had testified as an expert witness in both the Federal and State courts in regard to the establishment of points of impact in motor vehicle cases. In view of these facts we perceive no abuse of discretion on the part of the trial court in permitting Officer Rogers to testify as an expert witness and to express an opinion in regard to the point of impact in the present case.

## 1 (b)

The appellants contend, however, that even if Officer Rogers might qualify as an expert in some subjects, his expert opinion in regard to the point of impact in this case was not admissible as this was a question which the jury, itself, could decide upon the facts without the assistance of testimony based on special skill or study. The proposition is stated too broadly. The Maryland rule is not whether the jury could possibly decide the issue without expert help, but whether the expert testimony would be of appreciable help to the jury in resolving the issue. Here again, the determination of whether or not the expert testimony will be of appreciable help to the jury is within the sound discretion of the trial court. See *Shivers v. Carnaggio,* 223 Md. 585, 165 A. 2d 898 (1960) in which Judge (now Chief Judge) Hammond, for the Court, carefully reviews the authorities on this question. *State v. Gray,* 227 Md. 318, 176 A. 2d 867 (1962). See *Andrews v. Andrews,* 242 Md. 143, 218 A. 2d 194 (1966).

In *Gray, supra,* the admissibility of the testimony of a State trooper as an expert in regard to the proper interpretation of skid and swerve marks and gouges in the road at the site of the accident and their significance as to where the impact took place was involved. In holding that the trial court did not abuse

its discretion in admitting this testimony, Judge Sybert, for the Court, stated:

> "Admission of such testimony was in the sound discretion of the trial court, *Williams v. Dawidowicz,* 209 Md. 77, 120 A. 2d 399 (1956), and we fail to find any abuse of that discretion in this case. The trooper, as investigating officer, qualified as an expert, *Acme Poultry Corp. v. Melville,* 188 Md. 365, 53 A. 2d 1 (1947), and, as was said in *Harper v. Higgs,* 225 Md. 24, 38, 169 A. 2d 661 (1961), '* * * an approved test as to the admissibility of expert opinion is whether *the jury can receive appreciable help from the particular witness on the subject, not whether the jury can decide the particular issue without expert help. * * *.'* The interpretation of skid and swerve marks and gouges in the road at the site of the accident and their significance in regard to where the impact took place was a proper subject for expert testimony and the trial court's ruling in this respect was not erroneous. Cf. *Miller v. Graff,* 196 Md. 609, 78 A. 2d 220 (1951)." (227 Md. at 321-22, 176 A. 2d at 868-69.) (Emphasis supplied.)

In our opinion, the trial court did not abuse its discretion in concluding that Officer Rogers' expert testimony in regard to the point of impact would be of substantial assistance to the jury in determining this issue. Such evidence is especially helpful when a party is not competent to testify. See *Scott v. James Gibbons Co.,* 192 Md. 319, 328-30, 64 A. 2d 117, 122 (1949). See also Annotation, *Admissibility of Opinion Evidence as to Point of Impact or Collision in Motor Vehicle Accident Case,* 66 A.L.R.2d 1048, 1052, 1053, 1056, 1058, 1960, 1065-67 (1959) ; 9C Blashfield, *Automobile Law and Practice,* Sec. 6316 (Supp. 1964).

### 1 (c)

In their final challenge to Officer Rogers' expert testimony, the appellants argue that, in any event, his expert opinion in regard to the point of impact was not supported by the alleged facts upon which he relied in formulating his opinion, citing

our opinion in *State v. Critzer,* 230 Md. 286, 186 A. 2d 586 (1962) in which we indicated that an expert witness must predicate his opinion on premises of facts which must disclose that the expert is sufficiently familiar with the subject matter under investigation in order "to elevate his opinion above the realm of conjecture and speculation." The principle enunciated is, of course, a sound one, but in our opinion Officer Rogers' premises of facts, in the context of his almost immediate presence at the scene of the accident, his observation of all the physical facts and his recording of them and the point of impact on his diagram (plaintiffs' Exhibit No. 5), are sufficient to meet the test enunciated in *State v. Critzer, supra.*

The three premises of fact on which Officer Rogers based his opinion were (1) the position of the left shoe of Mrs. Phelps, (2) the blood which he found at the scene of the accident, and (3) the dirt found at the scene. The appellants point out that Officer Rogers admitted on cross-examination that it is possible that when people are struck to have their shoes fly off, that the blood ran in the same direction as the grade of Preston Street and that his examination of the bus was limited to looking for damage on its exterior surface and to examine the left front wheel. In our opinion these observations go to the weight of Officer Rogers' testimony and not to its admissibility. The fact that the *left* shoe is shown on the photographs showing the front of the bus at the scene (plaintiffs' Exhibit No. 1) *at the beginning* of the blood trail, while the other shoe is shown in front of the bus, together with the severe injuries to the *left foot and leg* of Mrs. Phelps reasonably indicates that the left wheel of the bus on which blood and flesh were found did pinch Mrs. Phelps' left foot and leg (as Nizer suggested) and pushed Mrs. Phelps forward to where her body finally came to rest. The presence of dirt at the same point is some evidence that it came from the bus at or near the point of impact. Officer Rogers had testified that he had observed from his experience in investigating accidents that "when two vehicles collide there is dirt, debris and disturbance. Where the contact is made, this dirt and debris drops to the street; that can vary from approximately two inches to approximately a foot and can be scattered further if the vehicles move away and

carry it off with them." The fact that the left wheel of the bus is standing in the blood trail indicates that the blood lying to the east of the left wheel, and in which there were tire marks, *did not* flow down from the larger pool of blood formed where Mrs. Phelps' body ultimately came to rest, from which it could reasonably be inferred that the blood lying to the east of the left wheel began at the point of impact. These, and the surrounding facts appearing on the diagram, indicate to us Officer Rogers had sufficient premises of fact to support his expert testimony in regard to the location of the point of impact which he indicated on his diagram as being in the pedestrians' crosswalk nine feet west of the eastern line of the crosswalk (the crosswalk has a total width of 14 feet at this point), and as we have indicated this opinion is supported by the photographs showing the front of the bus (plaintiffs' Exhibit No. 1) at the time Officer Rogers arrived at the scene of the accident, and by his diagram (plaintiffs' Exhibit No. 5) which the trial court properly admitted into evidence. In our opinion, there was no abuse of discretion by the trial court in admitting the expert testimony of Officer Rogers in regard to the point of impact in this case.

2.

The appellants contend that the trial court in its instructions to the jury gave undue prominence to Officer Rogers' expert testimony and thereby committed prejudicial error. We do not agree.

The trial court instructed the jury, in relevant part on this issue, as follows:

"The rules of evidence ordinarily do not permit a witness to testify as to his opinion or conclusion. You will recall that during the course of the trial the police officer who testified was offered by the Plaintiff as a fact witness and also as an *expert* witness. There was objection made by the Defendants, and after a number of preliminary questions, the Court permitted him to testify as to the location of the point of impact, which is in effect permitting him to testify as an expert witness. An expert witness is an exception to this rule

that a person can't give opinion testimony. A witness who by education or experience has become expert in any art, science or profession may be permitted to state his opinion as to a matter in which he is versed and which is material to the case, and may also state the reasons for such opinion. This testimony should be considered and weighed by you like any other evidence in the case, and given the weight to which you deem the opinion to be entitled.

"*You may reject the opinion if the facts upon which it was based have not been established to your satisfaction by the officer, or if you're not satisfied with the reasons given in support of this opinion.*" (Emphasis supplied.)

Under the circumstances of this case, it is our opinion that this portion of the charge was entirely fair and clearly left the determination of the entire matter of this opinion evidence to the jury both as to weight and to entire rejection if the jury was not satisfied that the facts on which it was based had not been established or if not satisfied with the reasons given in support of the opinion. This is in accord with the applicable rule.

As Chief Judge Brune, for the Court, aptly stated in *Alston v. Forsythe,* 226 Md. 121, 129, 172 A. 2d 474, 477 (1961):

"The court's references to the facts were, we think, within the established rule that the trial judge 'may call the attention of the jury to the parts of * * * [the evidence] which he thinks important, and he may express his opinion upon the facts, provided that he makes it clear to the jury that all matters of fact are submitted for their determination.' *Snyder v. Cearfoss,* 190 Md. 151, 161, 57 A. 2d 786, substantially quoted in *Reindollar v. Kaiser,* 195 Md. 314, 319, 73 A. 2d 493; Md. Rule 554 b 2."

### 3.

The appellants urge upon us that the trial court abused its discretion in conducting the jury on a "view" of Mrs. Phelps

at the nursing home under the circumstances of this case. They argue that inasmuch as they did not contest the evidence offered on behalf of Mrs. Phelps that her mental incapacity was the proximate result of the injuries received by her in the accident and that they advised the trial court that they did not intend to controvert any medical evidence presented on behalf of Mrs. Phelps, there was no need for a "view" of Mrs. Phelps at the nursing home and that conducting such a "view" could only influence and impassion the jury.

The appellants concede that under the Maryland law the exhibition of the injured portions of the body of a person in a civil action is within the sound discretion of the trial court. See *Garozynski v. Daniel,* 190 Md. 1, 57 A. 2d 339 (1948); *Yellow Cab Co. v. Henderson,* 183 Md. 546, 39 A. 2d 546 (1944); and *Zeller v. Mayson,* 168 Md. 663, 179 A. 179 (1935). See also 29 Am.Jur.2d *Evidence,* Section 778 (1967), McCormick, *Evidence,* Chapter 21, Section 182 (1954), 4 Wigmore, *Evidence,* Section 1158 (3rd Ed. 1940) and the Annotation, *Propriety of Permitting Plaintiff in Personal Injury Action to Exhibit His Person to Jury,* 66 A.L.R.2d 1334 (1959).

It is correct, as the appellants point out, that counsel for the appellees had a photograph showing the injuries to Mrs. Phelps' legs, but did not show her face (plaintiffs' Exhibit No. 14 for Identification Only) and the appellants wished to substitute the photograph for the contemplated "view" of Mrs. Phelps at the nursing home. The trial court, however, was of the opinion that the jury was entitled to see Mrs. Phelps as a person and that the court and jury should see her at the nursing home under carefully outlined restrictions to prevent any inflammatory effects upon the jury. Mrs. Phelps was properly robed so that her physical injuries could not have an inflammatory result. She did not cry out, weep or otherwise indicate any acute emotional disturbance at the time the jury saw her at the nursing home.

Before exercising his discretion to permit the visit of the jury to the nursing home, the trial court carefully considered the matter and stated the following:

"Request has been made by counsel for the Plaintiff that the Jury be afforded an opportunity to see the

Plaintiff. Whether this should or should not be done,
as I understand the law, is completely within my sound
discretion; the only limitation being that I should not
abuse that discretion.

"Generally, a Plaintiff, even one in the condition of
the Plaintiff in this case, is entitled to have the Jury
observe him or her as the case may be, and his or her
condition. This is a right which cannot be taken away
from a Plaintiff lightly or arbitrarily. The other end
of the spectrum is that in seeing a Plaintiff, the result
should not be inflammatory so far as the Jury is con-
cerned. First, my observation of this Jury is that they
are rather solid citizens, and even though the majority
of them are women, they appear, at least to me, to be
not of the highly emotional or flighty type. I may be
in error on that, but that's my observation.

"Secondly, Jury has heard all the gruesome facts
about this lady and the accident; they have heard her
described as she was before the accident; they have
heard her described as she is now by Dr. King, and by
three friends who have known her for varying periods,
one for 30 years, another for 50 years and another for
60 years, and who have seen her since the accident a
number of times at the nursing home and at least one
of them saw her in the hospital. The condition of this
lady certainly would be more disturbing, in my judg-
ment, to intimate friends such as these three ladies who
just testified, then it would be to a casual observer
such as the Jury. The three ladies who testified did
not signify any real emotion of any kind when they
testified; they were perfectly calm in the way they
gave their testimony, and when they were testifying
about her present condition. The Court particularly
asked Dr. King, who was a well-known well-thought
of specialist in internal medicine, whether a visit of the
Jury to the nursing home would have any serious ef-
fect on Mrs. Phelps, and his answer was no. Query
was made as to whether bringing her into the Court
room would have any serious effect on her, and his an-

swer was no. The Court further inquired whether bringing her into the Court room would be disruptive of the Court's proceedings because of some past history of her crying out and even as to this question, Dr. King's answer was no, because he said that her crying out on recent occasions when he had seen her at the nursing home had not been nearly as apparent as it was earlier in the history of this accident.

"Therefore, the sum and substance of the foregoing, is that in the judgment of the Court, permitting the Jury to see the Plaintiff would not be inflammatory, would not upset them any more than they have been upset so far by the testimony, and that doesn't seem to be to any great extent. I have been trying to keep my eye on the Jury throughout the course of the testimony, and I haven't observed any real emotional impact on the Jury, even on the women."

Under the rather unusual circumstances of this case, we are not prepared to say that the trial court abused its discretion in permitting the "view" and the record does not indicate to us that the jury was inflamed as a result of it.

4.

The appellants contend that the trial court erred in refusing to instruct the jury in regard to their theory of the case, *i.e.,* that Mrs. Phelps left a place of safety on the north sidewalk of Preston Street at a point west of the marked crosswalk and walked across Preston Street headed for the southwest corner of the intersection and was struck at a point when she nearly reached the westernmost boundary of the marked crosswalk.

After instructing the jury on the law relative to evaluating evidence, burden of proof and the law in regard to the testimony of expert witnesses, with a reference to the testimony of Officer Rogers, as already set forth, as well as definitions of negligence and of contributory negligence, and the effect of the latter, the trial court instructed the jury, in part, as follows:

"Every person is required to obey traffic laws. Such a person may act on the assumption that other users

of the highway will obey such laws, but such a person cannot assume after he has discovered or by reasonable care should have discovered that such other persons probably will not obey such traffic law. Now, there is a special rule of law, a statute in effect in Maryland, of which you should be advised and which has been referred to during the course of this case already. The law of Maryland pertaining to the movement of motor vehicles and pedestrians at intersections is as follows: In general—all pedestrians shall have the right-of-way at street crossings in the towns and cities of this State, except where traffic is controlled at such crossings by traffic officers, or traffic control devices—and there were none in this case. Between street crossings in such towns and cities, vehicles shall have the right-of-way. This of course, was in Baltimore City, so this particular statute is applicable to this case depending upon how you find the evidence in this case.

"Highways are for the use of everyone, whether pedestrians or motorists, and no one is barred by age or physical condition of using them. While both a pedestrian and a driver have an equal right to use the street, the amount of diligence and care needed on the part of each is shifted from one to the other according to *where the accident happens;* that is, whether it happens *at an intersection or between crossings. When a pedestrian crosses between intersections or crossings, the law requires him to know that he must accommodate himself to vehicles on the road, and he cannot dispute their right-of-way, but must cross only as traffic affords safe opportunity.*

"When crossing in a street intersection in a crosswalk, as previously stated, the pedestrian has the right-of-way, but must exercise due care in crossing, and cannot proceed blindly and without looking for vehicular traffic lawfully using the street. Similarly, it is the duty of the driver at a street crossing to look carefully ahead and keep his vehicle under such con-

trol as to be able to avoid injury to pedestrians lawfully crossing an intersection in a crosswalk, and to warn such persons whenever necessary by proper signals of his approach.

"Likewise, between street crossings although as stated, the operator of a motor vehicle has the right-of-way, he too must exercise due care to observe pedestrians in the street, and cannot proceed without looking out for such pedestrians. *The operator of a motor vehicle crossing an intersection has a right to complete that movement if there are no pedestrians in the crosswalk at the time when the vehicle is about to cross the crosswalk.*" (Emphasis supplied.)

In our opinion, this portion of the charge adequately presented the appellants' theory of the law to the jury and it was not necessary, or even desirable under the facts in this case, to elaborate on specific elements of proof. In short, the appellants received from the trial court's instructions as beneficial an instruction as the case justified.

As Chief Judge Brune stated in *Alston v. Forsythe, supra,* in referring to the trial court's instructions in that case:

"They correctly stated that at intersections the pedestrian has the right of way and between intersections the motorist has it. They also made it clear that, regardless of the place of the accident, neither has an absolute right to proceed in disregard of danger to himself or to the other party. No useful purpose would be served by restating established rules as to the relative rights of way and duties of pedestrians and motorists, at or between intersections, including the duty of a motorist to maintain a proper lookout and to have his car under control. [Citing a number of Maryland cases.]

\* \* \*

"We think that there was no need for the court to read various sections of the motor vehicle law to the jury where those matters upon which an instruction was appropriate were covered by the charge. Taken

as a whole, the instructions of the trial court covered the law of the case fairly and adequately. That is sufficient. [Citing several Maryland cases.]" (226 Md. at 135, 172 A. 2d at 480-81.)

## 5 (a) and (b)

The appellants finally contend that the trial court erred in not granting their prayer for a directed verdict in their favor because (a) there was no legally sufficient evidence of primary negligence, and (b) in any event, the evidence established that Mrs. Phelps was guilty of contributory negligence as a matter of law. Again, we do not agree.

The thrust of the arguments of the appellants is based upon two propositions which are not applicable in the present case, *i.e.*, (1) that Mrs. Phelps is *bound by the testimony of Nizer* that when he first saw her she was standing on the north sidewalk of Preston Street and when he turned his head again while negotiating the left turn from Howard Street, he saw Mrs. Phelps hurrying between two vehicles making right turns from Howard Street into Preston Street and was in the immediate path of his bus, approximately three feet from it; he immediately brought the bus to a stop but not until the front of the bus struck Mrs. Phelps who fell backwards into the bed of Preston Street, and (2) that this evidence is the only evidence in regard to how the pedestrian and bus moved prior to impact between them and hence there is no legally sufficient evidence of primary negligence for submission to the jury. The appellants rely primarily on our decision in *Bond v. Forthuber*, 198 Md. 476, 84 A. 2d 886 (1951).

In regard to the first proposition, Chief Judge Brune, for the Court, stated the Maryland law in *Lehmann v. Johnson*, 218 Md. 343, 349, 146 A. 2d 886, 889 (1958) to be as follows:

"The general rule in this State is that if one party calls an adverse party as a witness, he is bound by his adversary's testimony, unless it is contradicted or discredited. See *Maszczenski v. Myers*, 212 Md. 346, 352, 129 A. 2d 109, and cases therein cited, construing Code (1957), Article 35, Section 9 (the cases prior to *Maszczenski* dealing with that Section as enacted

by § 4 of Chapter 109 of the Acts of 1864 as it stood prior to its amendment by Chapter 380 of the Acts of 1939), and *Proctor Electric Co. v. Zink,* 217 Md. 22, 32-35, 141 A. 2d 721. However, as is pointed out in the *Proctor Electric Co.* case (217 Md. at 32, 33), the cases referred to 'are not to be interpreted as meaning that a party is bound by each and every statement made by an adverse witness called by him,' and the 'testimony of a witness may be contradicted or discredited by circumstances as well as by statements of other witnesses, and a jury is not bound to accept a witness' testimony as true if it contains improbabilities, or if there are reasonable grounds for concluding that it is erroneous.' "

See also *Trusty v. Wooden,* 251 Md. 294, 247 A. 2d 382 (1968).

The facts already mentioned show Nizer's testimony was contradicted by the physical facts shown in the exhibits as well as by Officer Rogers' expert testimony in regard to the point of impact and other parts of his testimony. It is indeed improbable that Mrs. Phelps, on her way south on the west side of Howard Street would not walk directly into the walkway as she would naturally do in view of the projection of the stairway of the Fifth Regiment Armory, but, on the contrary, would not do this, but would turn, walk ten feet west on Preston Street (out of her way) and then proceed to cross Preston Street west of the walkway between two automobiles turning right from Howard Street into Preston Street. This is on its face most improbable behavior. Not only that, but his testimony is in conflict with the testimony of Officer Rogers that Nizer told him at the scene of the accident that Mrs. Phelps was crossing from the northwest to the southwest corner. Nizer admitted this in his deposition. Nizer also admitted three times in his deposition that Mrs. Phelps was in the crosswalk. In his Answer to Interrogatories he never stated that Mrs. Phelps was on the north side of Preston Street when he first saw her and admitted that this came to his memory only a month prior to trial when he gave a *third statement* to Baltimore Transit. It is clear that

Mrs. Phelps was not bound by the statements on which the appellants rely. The question of primary negligence was properly submitted to the jury by the trial court.

The present case is to be distinguished from our recent decision in *Williams v. Wheeler,* 252 Md. 75, 249 A. 2d 104, in which the testimony of the adverse witnesses was the *only testimony* on the question of agency, and was *not contradicted or discredited by any circumstances* or other testimony.

In regard to contributory negligence, Mrs. Phelps, because of her mental condition resulting from the injuries suffered, was not able to testify in the case. Under the law of Maryland she was entitled to the presumption that she exercised ordinary care for her own safety. *Baltimore Transit Co. v. State,* 194 Md. 421, 434, 71 A. 2d 442, 447 (1950) ; and prior Maryland cases cited in the opinion in that case. See also *Jennings v. U. S.,* 178 F.Supp. 516, 526, 529 (D. Md. 1959).

The physical evidence which we have already mentioned would give rise to the inference that the left front wheel of the bus caught and pushed Mrs. Phelps' left leg at the east end of the trail of flesh and blood which was nine feet west of the east line of the crosswalk and therefore within the crosswalk for pedestrians. It could not be said as a matter of law that Mrs. Phelps was guilty of contributory negligence. In *Lipphard v. Hanes,* 232 Md. 405, 408, 194 A. 2d 93, 95 (1963), Judge (now Chief Judge) Hammond, for the Court, stated :

> "The pedestrian who is crossing the street at a crosswalk in a town has the right of way, Code (1957), Art. 66½, Sec. 236, and may rely on a motorist respecting that right unless it is or becomes apparent that the motorist will not. Ordinarily, a pedestrian who would be guilty of contributory negligence as a matter of law if he were not favored as to right of way by the statute may, if so favored, have the jury pass on the question because he was not required to foresee that his rights would not be honored and was entitled to rely on respect for those rights by approaching motorists."

The Maryland Statute gave Mrs. Phelps, as a pedestrian, the

right of way at the street crossing. Code (1957), Article 66½, Sec. 236.

Then too, we have held that even if a pedestrian is struck while crossing a street between street crossings, that fact standing alone is insufficient to establish contributory negligence, as a matter of law. *Nance v. Kalkman,* 223 Md. 564, 568, 569, 165 A. 2d 757, 759 (1960).

The present case is distinguishable from *Bond v. Forthuber, supra,* in that in *Bond* the *plaintiff's own testimony* together with evidence of the defendant and the legitimate inferences from the testimony favorable to the plaintiff were legally insufficient to show that the defendant's alleged negligence proximately caused the accident, but on the contrary showed conclusively that the plaintiff's own negligence either directly caused or contributed to the accident. As we have indicated, we have a very different factual situation in the present case.

*Judgment affirmed, the costs to be paid by the appellants.*