POTOMAC SAND AND GRAVEL COMPANY *v.*
GOVERNOR OF MARYLAND ET AL.

[No. 35 (Adv.), September Term, 1972.]

*Decided July 6, 1972.*

The cause was argued before HAMMOND, C. J., █ and BARNES, MCWILLIAMS, and SMITH, JJ., and KENNETH C. PROCTOR, Associate Judge of the Third Judicial Circuit, specially assigned.

*James J. Doyle, Jr.,* with whom were *John B. Jaske, Sherbow, Shea & Doyle* and *Victor H. Laws* on the brief, for appellant.

*Henry R. Lord, Deputy Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Warren K. Rich, Special Assistant Attorney General,* on the brief, for appellees.

*Amicus Curiae* brief filed by Maryland Conservation Council et al., *Timothy J. Bloomfield, George W. Wise* and *Alvin Ezrin* on the brief.

PER CURIAM:

On June 30, 1971, Potomac Sand and Gravel Company (Potomac Company) filed a bill for declaratory judgment in the Circuit Court for Anne Arundel County in which it requested that the Laws of Maryland (1971), Chapter 792; Code of Public Local Laws of Charles

County (1969 Ed.), Article 9, section 337A (Chapter 792) be declared to be unconstitutional.

The decree, from which this appeal was taken, was signed by Judge Evans on March 3, 1972, and implemented an opinion filed several days earlier.

We adopt the excellent, careful and comprehensive opinion of the trial judge, which follows:

"The Maryland Legislature on 28 May 1971 enacted Chapter 792 as a public local law of Maryland limited to the geographical boundaries of Charles County. Chapter 792 took effect 1 July 1971 and reads:

"(a) It shall be unlawful to dredge for sand, gravel or other aggregates or minerals, in any of the tidal waters or marshlands of Charles County, providing that this section shall not conflict with any necessary channel dredging operation for the purposes of navigation.

(b) Any person violating the provisions of this section shall, upon conviction thereof, be punished by a fine of not less than five hundred dollars ($500.00) nor more than twenty-five hundred dollars ($2,500.00), providing further that each day such offense continues shall be a separate violation of this Section and subject to penalties thereof."

Potomac Company is engaged in the business of dredging sand and gravel found in Maryland and Virginia. The sand and gravel is removed from deposits found in land owned by the plaintiff and from the beds of tidal waters surrounding that land. It is floated on barges to the District of Columbia where it is sold for use primarily in the construction industry.

Potomac Company is the owner of three parcels of land, the uses of which are at issue in the case at bar. All three parcels are located in Charles County, Maryland, and all three are adjoined to or surrounded by State wetlands. State wetlands are the lands under the navigable waters of the State below the mean high tide, which

are affected by the regular rise and fall of the tide. Code, Article 66C, sec. 719 (a) (1970 Replacement Volume), also known as the Wetlands Act of 1970. All three parcels are within the proscription of Chapter 792.

1. The Mattawoman tract is an area of about 1015 acres on Mattawoman Creek. Dredging is proposed for 300 of these 1015 acres. Of the 300 acres, 70% are below mean high tide, or in other words are State wetlands. Code, Article 66C, sec. 719 (a) ; *Bd. of Pub. Works v. Larmar Corp.*, 262 Md. 24, 277 A. 2d 427 (1971). The depth of the dredge sites at Mattawoman Creek is presently between two and twelve feet. Potomac Company proposed to dredge to an overall depth of fifty feet.

Mattawoman Creek is one of ten main spawning streams supporting anadromous fish in the drainage system of the Potomac River. It is one of the finest freshwater marshes in the Upper Potomac Estuary, and is the *only* area along the Maryland shores where the rare native lotus (water lily) and [zizania aquatica] (wild rice) are to be found. Its aquatic plants act as a rinsing agent by absorbing and using in their biological process pollutants, suspended dirt particles, and other inorganic materials that, in excessive amounts, cause conditions of aquatic overfertilization. The vegetation is an important source of dissolved oxygen, food, and protection necessary for anadromous fish which utilize the marshes for resting and spawning each spring.

Mattawoman Creek is a spawning area for yellow perch, white perch, striped bass and herring; in addition, sunfish, pike, shad, and catfish can be found there. It is also a habitat for the bald eagle, black duck, mallard duck, deer, rabbit, mink, otter, beaver, and has one of the larger wood duck roosts.

Potomac Company paid a total of $1126 property taxes in 1970 for its interests in the Mattawoman Creek property. It is estimated that there are 10 million tons of sand and gravel in Mattawoman Creek which Potomac Company seeks to dredge.

2. Craney Island, the total size of which alters due to

the ebb and flow of the Potomac River, is located entirely within the Potomac River. While Potomac Company's deed recites Craney Island to be thirty acres (aerial photographs indicate a few trees protruding from the center of the Potomac River), Potomac Company acknowledges in its memorandum that actually no more than one acre of Craney Island is usually above water. Potomac Company paid taxes in 1970 on .26 acre—a total of $48.53 property taxes for its interests in the Craney Island parcel. The dredge site claimed by Potomac Company is 1400 acres. Of these 1400 acres, 700 acres are proposed to be actually dredged. All 700 proposed acres are below mean high tide, or in other words are State wetlands. Code, Article 66C, sec. 719 (a) ; *Bd. of Pub. Works v. Lamar Corp., supra.*

The Craney Island area is the habitat of diving ducks which dive beneath the water's surface to retrieve food. Perch, shad, herring and bass fish are also found in the area of Craney Island.

3. The Greenway Flats tract consists of two strips of land bordering on the Potomac River, one of which is ninety feet wide and the other five feet wide. Together they are 1.8 miles long. The proposed dredge site is 1000 acres, all of which are below mean high tide, again constituting State wetlands as defined in Code, Article 66C, sec. 719 (a) ; *Bd. of Pub. Works v. Larmar Corp., supra.* Potomac Company paid $177.00 property tax in 1970 for its interest in this land. It has dredged approximately 7.7 million tons of sand and gravel out of this site, leaving it 90% dredged. The area has been dredged from a depth of 10 feet to a depth of 50 feet below mean low water, a depth which Potomac Company intends, if so permitted, to dredge all three areas. The Greenway Flats tract is the only site presently being dredged by Potomac Company, and this is being done pursuant to a temporary order of this court.

It is significant that in Potomac Company's deed of the Greenway Flats tract it is referred to as "Greenway Fishing Shore" and "Greenway Fishery".

## MARYLAND LAW RE: RIPARIAN RIGHTS AND RIGHTS TO SAND AND GRAVEL

Prior to 1862 the rights of owners of riparian land in Maryland regarding the dredging, taking and carrying away of sand and gravel from the beds of navigable waters were primarily controlled by the common law. The common law provided that navigable waters were vested in the public:

> "Rivers or streams within the ebb and flow of tide, to high water mark, belong to the public, and in that sense are navigable waters; all the land below high water mark, being as much a part of the 'jus publicum', as the stream itself. The owners of adjacent ground had no exclusive right to such lands, nor could any exclusive right to their use be acquired, otherwise than by an express grant from the State." *Day v. Day*, 22 Md. 530, 537 (1865).

In 1862, the Maryland Legislature enacted Laws of Maryland (1862), Chapter 129, vesting riparian owners in Maryland "with rights and privileges not recognized by the common law", in particular the right to all accretions to riparian land by recession of water by natural causes or otherwise. *Day v. Day, supra,* page 537; Laws of Maryland (1862), Chapter 129.

Between 1862 and 1888, the common law's absolute prohibition on the taking of sand and gravel had deteriorated to the point that the Legislature of 1888 re-asserted its authority over the State's wetlands. It did so by enacting Laws of Maryland (1888), Chapter 362. Not at all dissimilar to Chapter 792, the validity of which is at issue in the case at bar, but broader in scope, Chapter 362 was a blanket prohibition against anyone from digging, dredging, taking and carrying away any sand, gravel or other material from the bed of the Potomac River, from its mouth to the uppermost boundary line of Prince George's County. Chapter 362, as does Chapter 792,

provided criminal sanctions for violations, except that unlike Chapter 792 which imposes a fine only, Chapter 362 imposed a fine, confiscation of dredge, boat or vessel used in dredging, and imposed imprisonment of up to six months.[1]

In 1900 the Legislature again slackened its absolute prohibition on the taking and carrying away of sand and gravel from the Potomac River by enacting Laws of Maryland (1900), Chapter 577. Chapter 577 excepted riparian owners on the Potomac River from Chapter 362's prohibition and permitted them to take and carry away sand and gravel from the river bed subject only to non-interference with navigation, oystering and fishing.[2] This exception was extended in 1906, along with

---

1. Section 1. Be it enacted by the General Assembly of Maryland, That it shall not be lawful for any person to dig, dredge, take and carry away any sand, gravel or other material from the bed of the Potomac river, from its mouth to the uppermost boundary line of Prince George's county, under a penalty of a fine not exceeding three hundred dollars, and confiscation of the boat, vessel, dredge and implements used in digging, dredging and carrying away such sand, gravel or other material, and imprisonment in the county jail for a period not exceeding six months, in the discretion of the court; one-half of said fine and one-half of the proceeds of the sale of such confiscated boat, vessel, dredge and implements to be paid by the sheriff to the informer, and the other half to the commissioners of the public schools for the county.

Sec. 2. And be it enacted. That this act shall take effect from the date of its passage.

Approved April 4, 1888.

2. 244. It shall not be lawful for any person to dig, dredge, take and carry away any sand, gravel or other material from the bed of the Potomac River, from its mouth to the uppermost boundary line of Prince George's County, under a penalty of a fine not exceeding three hundred dollars, and confiscation of the boat, vessel, dredge and implements used in digging, dredging and carrying away such sand, gravel or other material, and imprisonment in the county jail for a period not exceeding six months, in the discretion of the Court; one-half of said fine and one-half of the proceeds of the sale of such confiscated boat, vessel, dredge and implements to be paid by the Sheriff to the informer, and the other half to the Commissioners of Public Schools for the county; provided, however, that it shall be lawful for any riparian owner of lands bordering on said Potomac River, or for any person or corporation with whom such owner shall have a contract in writing for the purpose, or for the agents, servants or employees of such person or corporation to dig, dredge, take and carry away sand, gravel or other material from the bed of said river opposite said lands from high water mark on the shore bordering on

the 1888 prohibition, to apply to all navigable waters in the State of Maryland.[3] The prohibition of 1888 and its exception and extension were codified in 1957 by Laws of Maryland (1957), Chapter 498, as Article 27, sec. 485.

In 1970 the Legislature repealed Article 27, sec. 485, and replaced it with Laws of Maryland (1970), Chapter 241, Code, Article 66C, sec. 718 et seq. (Wetlands Act of 1970). Under Section 721 of the Wetlands Act of 1970, it is unlawful for a riparian owner, without a license issued by the Board of Public Works, to dredge, take and carry away sand, gravel or other material from the bed of any of the navigable rivers, creeks or branches in Maryland. *Bd. of Pub. Works v. Larmar Corp., supra,* page 53.

Most recently, the Legislature enacted Chapter 792. Chapter 792, as hereinbefore recited, is more restrictive than the permit procedure of the Wetlands Act of 1970, but less prohibitive in geographical scope than Chapter 362, Laws of Maryland 1888.

Potomac Company has filed application for the appropriate permits for dredging at the three named sites in compliance with the Wetlands Act of 1970. Hearings were held in December 1970 and April 1971. Decision is withheld, pending this litigation.

The basic conflict here is whether the legislature by enacting Public Local Law, Chapter 792, may absolutely prohibit anyone, including Potomac Company, from dredging, taking and carrying away sand and gravel from the tidal waters or marshlands of Charles County.

---

said lands to the outer line of the channel nearest said shore, subject to the laws of the United States relating to navigation. And provided, further, that none of the provisions of this section shall be deemed to interfere in any manner with the provisions of any law of the State of Maryland relating to the taking and catching of fish and oysters.

Sec. 2. And be it enacted, That this act shall take effect from the date of its passage.

Approved April 7, 1900."

3. Chapter 426, Laws of Maryland 1906.

## ISSUES

The issues considered are: (1) whether Chapter 792 is unconstitutional as a taking of private property for a public use without just compensation, (2) whether Chapter 792 is a violation of equal protection by an arbitrary classification, (3) whether Chapter 792 is a violation of [the Constitution of Maryland,] Article III, sec. 33, [it being alleged that it is a] special law for which a general law, the Wetlands Act of 1970, is already enacted; and, (4) whether Chapter 792, as a penal statute, is unconstitutional as too vague and indefinite.

### (1)

Chapter 792 is a legitimate exercise of the police power by the Legislature to regulate and restrain a particular use, that would be inconsistent with or injurious to the rights of the public, of property within the control of the State. Such regulation and restraint is not an unconstitutional taking of private property for public use without just compensation, as prohibited by the Fourteenth Amendment of the United States Constitution and Article 23 of the Declaration of Rights of the Constitution of Maryland.

An early Massachusetts case, *Commonwealth v. Tewksbury*, 11 Met. 55 (1846) responds on point. In *Tewksbury*, the Legislature enacted a statute similar to Chapter 792:

> "Any person who shall take, carry away or remove, by land or by water, any stones, gravel or sand, from any of the beaches in the town of Chelsea, excepting, '& C.' shall, for each offense, forfeit a sum not exceeding twenty dollars, to be recovered, by complaint or indictment, in any court of competent jurisdiction."

This statute, as does Chapter 792, asserts an absolute prohibition on the taking, carrying away or removing of sand and gravel. Both are limited to single areas,

Chelsea and Charles County respectively, and both apply penal monetary sanctions for violations. In addition, the facts in *Tewksbury* and the case at bar are similar in that in both cases the statutes challenged were mere revisions of former statutes on the same subject.[4]

The riparian owners in *Tewksbury* (p. 55) raised two issues expressly decided upon by the Court. They asserted that as riparian owners in fee, the statute was not meant to apply to them. Secondly, the defendants alleged ". . . if the statute did so prohibit the owner, for any purpose of public benefit, from taking gravel from his own land, it was a taking of the land for the public use . . ." without compensation, in violation of the Massachusetts Declaration of Rights and that inasmuch as the statute did not make provision for compensation, it was unconstitutional and void.

The Court denied both arguments, holding that the statute applied to "any person" in the absence of any ground to imply an exception, and that the statute was not a taking, but a just and legitimate exercise of the police power of the Legislature. Briefly, the Court found that whether or not the means adopted by the Legislature were proper or even constitutional, or within the powers of the Legislature, the unambiguous intent of the Legislature was to apply the statute to everyone.

In the case at bar, the language of Chapter 792 (b) is clear that its prohibition applies to "any person" violating its provisions.

The Court in *Tewksbury* (pp. 57-58) responded to defendant's contention that the statute was not a taking of property for public use:

> "All property is acquired and held under the tacit condition that it shall not be so used as to injure the equal rights of others, or to destroy or greatly impair the public rights and interests of the community; under the maxim of the common law, *sic utere tuo ut alienum non laedas.*

4. See Note 1 and comments referred to.

When the injury is plain and palpable, it may be a nuisance at the common law, to be restrained and punished by indictment. As where one bordering on a navigable river should cut away the embankment on his own land, and divert the water course so as to render it too shallow for navigation. But there are many cases where the things done in particular places, or under a particular state of facts, would be injurious, when, under a change of circumstances, the same would be quite harmless. As the use of a warehouse for the storage of gunpowder, in a populous neighborhood, or for the storage of noxious merchandise, or the use of buildings for the carrying on of noxious trades, dangerous to the safety, health or comfort of the community. Whereas, in other situations, there would be no public occasion to restrain any use which the owner might think fit to make of his property. In such cases, we think, it is competent for the legislature to interpose, and by positive enactment to prohibit a use of property which would be injurious to the public, under particular circumstances, leaving the use of similar property unlimited, where the obvious considerations of public good do not require the restraint. This is undoubtedly a high power, and is to be exercised with the strictest circumspection, and with the most sacred regard to the right of private property, and only in cases amounting to an obvious public exigency. Still, we think, the power exists, and has long been exercised in cases more or less analogous."

A change of circumstances as hypothicated in *Tewksbury* prompted the Maryland Legislature to enact Chapter 792. Dredging which has been prohibited and permitted at various times and to differing degrees in Maryland is now prohibited by Chapter 792 in a manner which the Legislature deemed necessary to protect the public

welfare. This court does not question the Legislature's wisdom. *Cohen v. Bredehoeft,* 290 F. Supp. 1001, 1005 (1968) and cases cited therein.

Since *Tewksbury* was decided in 1846, the [courts have] refined the limits of the police power and fashioned appropriate tests. In *Cohen v. Bredehoeft, supra,* the Court said, at page 1005:

> "An exercise by the State of its police power is presumed to be valid when it is challenged under the due process clause. *Bibb v. Navajo Freight Lines,* 359 U. S. 520, 529, 79 S. Ct. 962, 3 L.Ed.2d 1003 (1959). A party attacking an ordinance on this basis has the burden of establishing its invalidity beyond reasonable doubt. *Standard Oil Co. v. City of Gadsden,* 263 F. Supp. 502 (1967)."

In due process questions in which there is an alleged taking without compensation, the first consideration is whether the statute is a taking by eminent domain requiring compensation, or a regulation of use under the State police powers.

Chapter 792 is a regulation of use under the State police powers. In *Goldblatt v. Town of Hempstead,* 369 U. S. 590, 82 S. Ct. 987, 8 L.Ed.2d 130 (1962), the Supreme Court analyzed a fact pattern similar to that of the case at bar, except that it entailed pit excavation and dredging rather than dredging of State wetlands. In *Goldblatt,* the Court held that eminent domain was inapplicable. Citing *Mugler v. Kansas,* 123 U. S. 623, 668-669, 8 S. Ct. 273, 31 L. Ed. 205 (1887), the Court said that a prohibition simply upon the use of a property for purposes that are declared by valid legislation to be injurious to health, morals or safety of the community, cannot be deemed a taking or an appropriation of property for public benefit. The Court went on to say that the owner could continue to use his property lawfully and that the owner could sell his property. The Court admitted that there were possible situations where regulation is so

severe that it constitutes a taking, but that the burden is on the challenger of the statute, and the burden had not been met.

Potomac Company cites *State v. Johnson*, 265 A. 2d 711 (Me., 1970), as a case in which, under the Maine Wetlands Act, the Court held that denial to a dredging company of a permit to fill marshlands was an unconstitutional taking of private property without compensation. Potomac Company reasons that if denial of a permit is a taking, then absolute prohibition certainly is a taking.

*State v. Johnson* is inapplicable. The Court limited its holding to the "facts peculiar to the case". The case at bar is not concerned with a legislative sanction of dredging in Charles County with an administrative permit procedure. Rather, the case at bar is a legislative prohibition. Chapter 792 was enacted less than a year after the Wetlands Act of 1970, and was intended to be more restrictive than the Wetlands Act of 1970. Finally, *State v. Johnson* is not the law in Maryland. *Bd. of Pub. Works v. Larmar Corp., supra,* pages 54-55.

Looking to the language of Chapter 792, it is a prohibition limited to dredging sand, gravel or other aggregates or minerals. This is a limitation upon a use of a property, not a taking. Chapter 792 is a valid exercise of the police powers. It is within the purview of the police powers for the State to preserve its exhaustible natural resources.

In *Zabel v. Tabb*, 430 F. 2d 199, 203-204 (1970), a case involving the right of the Army Corps of Engineers to deny a permit to fill tidelands in Boca Ciega Bay in St. Petersburg-Tampa, Florida, the U. S. Court of Appeals, Fifth Circuit, discussed the importance of the environment and the effects of dredging:

> "In this time of awakening to the reality that we cannot continue to despoil our environment and yet exist, the nation knows, if the Courts do not, that the destruction of fish and wildlife

in our estuarine waters does have a substantial, and in some areas a devastating, effect on interstate commerce. Landholders do not contend otherwise. Nor is it challenged that dredge and fill projects are activities which may tend to destroy the ecological balance and thereby affect commerce substantially." [5]

In *U. S. v. Moretti, Inc.*, 331 F. Supp. 151, 156-158, (D. C., Fla. 1971), the Court explains the importance of wetlands to the sustenance of wildlife, fish and local vegetation. It then discusses the devastating effects upon them by the dredging of those wetlands. The opinion recites Justice Holmes in *State of New Jersey v. State of New York*, 283 U. S. 336, 342, 51 S. Ct. 478, 75 L. Ed. 1104, 1106 (1931) : "A river is more than an amenity, it is a treasure."

The U. S. District Court, sitting in Maryland in *Corsa v. Tawes*, 149 F. Supp. 771, 774 (1957), a case prior to recent increase of public recognition of the degradation of our environment, has said:

"It is said that natural factors, beyond the control of man, such as weather, currents, and salinity, predominantly determine the abundance of fish, and it is the plaintiffs' insistence that the amount of menhaden withdrawn by fishing, regardless of the means employed, is *infinitesimal* in relation to the present menhaden population. Though there doubtless are differences of opinion among experts as to this and as to the need for an effectiveness of specific conservation measures, we cannot close our eyes to the manifold illustrations of experience, where man's over-exploitation has sharply diminished or even extinguished the supply of

---

5. While this is a commerce clause argument, the Court's recognition of the importance of environmental protection is impelling.

natural resources, wild game, and fish." [6] (Emphasis added.)

A few paragraphs later the Court went on to hold: "That a natural resource is subject to injury by causes beyond man's control is not a sufficient reason for us to require the State to refrain from such measures as may reasonably be taken to prevent unnecessary depredations by man."

The current trend is for courts to consider the preservation of natural resources as a valid exercise of the police powers. To determine the validity of a statute as an exercise of the police powers, the Supreme Court in *Goldblatt, supra,* page 134, citing *Lawton v. Steele,* 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385, 388 (1894) set forth a three pronged rule: (1) that the interests of the public generally, as distinguished from those of a particular class, require such interference; (2) that the means are reasonably necessary for the accomplishment of the purpose; and, (3) that the means are not unduly oppressive upon individuals.

Chapter 792 is not in violation of the *Lawton* rule. [It] does not benefit a particular class; rather, it benefits all citizens of Maryland. The means utilized are reasonably necessary in light of the potential harm as testified to at trial by experts for both parties.

It has already been noted that the sites in question support such species of fish as herring, American shad, hickory shad, striped bass, white perch and el perch, among others. These fish are sources for commercial fishing and sport fishing throughout Maryland. The testimony is undisputed that dredging would irreparably destroy the immediate marsh habitat, converting it into a deep-water habitat. Consequently, those anadromous fish which spawn in shallow waters and which instinctively return each year to the same spawning areas would be

---

6. Corsa dealt with the prohibition of the use of purse nets to catch menhaden fish. It is strikingly similar inasmuch as Potomac Company argues that its dredging sites are infinitesimal in relation to the rest of the Potomac River.

deprived of such spawning areas with a concomitant loss of the benefits of their reproductive process.

There was testimony that rare native vegetation at Mattawoman Creek would be destroyed by these particular dredging operations. Dredging increases the water's turbidity. Turbidity is the suspension of dirt particles in the water. A high turbidity reduces the amount of sunlight which reaches aquatic plants, which, through photosynthesis, produce oxygen for fish. The plants themselves are a food source for fish which would be reduced both due to the failure of plants to reproduce and by the smothering of plants by dirt particles.

Testimony also showed that Mattawoman Creek supports a declining but still substantial wildlife which would be frightened away by dredging noises as well as driven away by a loss of an accessible food supply. At Craney Island the diving ducks would be unable to readily retrieve their food fifty feet below the surface.

Potomac Company argues that the permit procedure [of the Wetlands Act of 1970] is a less drastic protective step which would fully protect the State's interests, and that Chapter 792 deprives it of a procedural hearing. The Legislature has declared, by Chapter 792, that the State's interests are best protected by a total prohibition of dredging of the State wetlands of Charles County. This court will not pass upon the Legislature's wisdom. *A & H Transp., Inc. v. Baltimore,* 249 Md. 518, 528, 240 A. 2d 601, 606 (1968) and cases cited therein; *Cohen v. Bredehoeft, supra.*

Potomac Company argues that Chapter 792 is unduly oppressive in that the loss it will sustain—the right to conduct a lawful business and the right as owners in fee to use its non-tidal lands and marsh freely, subject only to reasonable restrictions—is too great a loss in relation to the public benefits protected by [that Act.]

This argument is without merit. Chapter 792 only restricts dredging in tidal waters or marshlands of Charles County, subject to necessary channel dredging for navigation. Tidal waters and marshlands are statutorily de-

fined as State wetlands. By virtue of the Wetlands Act of 1970 and *Bd. of Pub. Works v. Larmar Corp., supra,* page 56, riparian owners are now in the same position as they were at common law, except that they may resort to the permit provisions of the Wetlands Act of 1970. Under the common law, the riparian owner could not himself, nor could he grant a right to another to take sand and gravel from the waterfront or shore of his land below high water mark. *Potomac Co. v. Smoot,* 108 Md. 54, 63-64, 69 A. 507, 510 (1908) ; *Day v. Day, supra,* page 537. In other words, Chapter 792 prohibits what the common law prohibited: dredging, taking and carrying away sand, gravel or other aggregates or minerals from State wetlands.

Testimony and evidence demonstrate that all the proposed dredge sites except 30% within Mattawoman Creek are State wetlands. It is the law in Maryland that unused riparian rights are not entitled to constitutional protections so long as they remain unexercised prior to the Legislature's revocation. *Bd. of Pub. Works v. Larmar Corp., supra,* page 50. Thus the State may regulate State wetlands which it is charged to protect, *Kerpelman v. Bd. of Public Works,* 261 Md. 436, 445, 276 A. 2d 56, 61 (1971) ; and the loss to Potomac Company is the 30% of potential sand and gravel at Mattawoman Creek. [Even if there is such a loss (and there was evidence that access to such area could be gained from the land side), it] * * * is not of such magnitude as to justify a finding that Chapter 792 is an invalid exercise of the State police power.

### (2)

Potomac Company argues that Chapter 792 is a denial of equal protection in that it prohibits dredging of sand and gravel from wetlands but does not prohibit the taking of sand and gravel from inland pit excavations in Charles County, and also in that it prohibits dredging sand and gravel in Charles County but not in neighboring counties.

Chapter 792 is not violative of the Equal Protection Clause of the Fourteenth Amendment. In *Allied American Company v. Comm'r,* 219 Md. 607, 623, 150 A. 2d 421, 431 (1959), the Court of Appeals, adopting the test established by the Supreme Court in *Lindsley v. Natural Carbonic Gas Co.,* 220 U. S. 61, 78, 79, 55 L. Ed. 369, 377 (1911), said:

> "Except where discrimination on the basis of race or nationality is shown, few police power regulations have been found unconstitutional on the ground of denial of equal protection, which may be what prompted the Supreme Court to call the equal protection clause the 'usual last resort of constitutional argument.'" (citing *Buck v. Bell,* 274 U. S. 200, 208, 71 L. Ed. 1000).

Rephrasing the Supreme Court in *Lindsley,* the Court then declared:

> "The constitutional need for equal protection does not shackle the legislature. It has the widest discretion in classifying those who are to be regulated and taxed. Only if the grouping is without any reasonable basis, and so entirely arbitrary, is it forbidden. Abstract symmetry or mathematical nicety are not requisites. The selection need not depend on scientific or marked differences in things or persons or their relations. If any state of facts reasonably can be conceived that would sustain a classification, the existence of that state of facts as a basis for the passage of the law must be assumed. The burden is on him who assails a classification to show that it does not rest on any reasonable basis. *Wampler v. LeCompte,* 159 Md. 222, 225; *Maryland Coal and Realty Co. v. Bureau of Mines,* 193 Md. 627; *Tatelbaum v. Pantex Mfg. Corp.,* 204 Md. 360, 370." (Citations supplied.)

In addition to the cases cited by the Court, more recent

cases include, among others, *McGowan v. Md.*, 366 U. S. 420, 6 L.Ed.2d 393, 81 S. Ct. 1101 (1961) ; *Rebe v. State's Attorney*, 262 Md. 350, 277 A. 2d 616 (1971) ; *Director v. Daniels*, 243 Md. 16, 49-50, 221 A. 2d 397, 416 (1966) ; *Creative School v. Bd.*, 242 Md. 552, 219 A. 2d 789 (1966).

Chapter 792 has an ecological purpose. As has been shown, the protection of exhaustible natural resources is a valid exercise of the police powers. The prohibition of anyone from dredging sand, gravel or other aggregates or minerals in the wetlands of Charles County is a rational regulation in light of the potential and real harm caused by dredging as testified to by experts for both parties.

To substantiate its first argument, Potomac Company asserts that the case at bar is analogous to the facts in *Beauchamp v. Somerset County*, 256 Md. 541, 261 A. 2d 461 (1970), in which the Court of Appeals invalidated a Maryland statute exempting from taxes or assessments one of three American Legion Posts in Somerset County.

Chapter 792 prohibits all dredging in the wetlands of Charles County by anyone, except necessary channel dredging for navigation. Chapter 792 was enacted to protect the wetlands of Charles County; it was not enacted to discontinue the taking of sand and gravel if such taking does not endanger the protected valuable wetlands of Charles County. Thus, the different facts in *Beauchamp* distinguish it from the case at bar.

In response to Potomac Company's second argument that Chapter 792 prohibits in Charles County what is not prohibited in a neighboring county, the Supreme Court in *McGowan v. Md., supra*, page 400, reiterated what it has previously held: that "the Equal Protection Clause relates to equality between persons as such, rather than between areas, and that territorial uniformity is not a constitutional prerequisite."

The burden being upon the party who assails a classification, Potomac Company has failed to show that Chap-

ter 792 does not rest on any reasonable basis. Both arguments put forth by Potomac Company are dismissed.

### (3)

Related to Potomac Company's equal protection argument is its assertion that Chapter 792 is a special law on a subject for which general legislation has been enacted and, therefore violates Article III, sec. 33 of the Constitution of Maryland. The general legislation Potomac Company refers to is the Wetlands Act of 1970.

In *Beauchamp v. Somerset County, supra,* page 548, the Court of Appeals, citing *Norris v. Mayor & C. C. of Baltimore,* 172 Md. 667, 681-682, 192 A. 531, 537 (1937), defined a public local law as a statute dealing with some matter of governmental administration local in character, in which persons outside of that locality have no direct interest. A special law is defined as a special law for a special case. The Court cited *Montague v. State,* 54 Md. 481, 489 (1880) for the proposition that Article III, sec. 33 ". . . was to prevent or restrict the passage of special, or what are more commonly called private Acts, for the relief of particular named parties, or providing for individual cases."

In *State v. County Comm'rs of Balto. Co.,* 29 Md. 516, 520 (1868), the Court of Appeals declared:

> "The special laws contemplated by the Constitution, are those that provide for individual cases. Local laws of the class to which the Act under consideration belongs, on the other hand, are applicable to all persons, and are distinguished from Public General Laws, only in this that they are confined in their operation to certain prescribed or defined territorial limits, and the violations of them must, in the nature of things, be local."

See also *Cole v. Secretary of State,* 249 Md. 425, 240 A. 2d 272 (1968).

While these definitions are not definitive, Chapter 792 resembles a public local law more than a special law. It does not provide relief of a particular named party. It is true that Potomac Company may be the only party affected by Chapter 792, but if others wished to dredge the wetlands of Charles County, they too would be prohibited from doing so. Chapter 792 is applicable to all persons, but is limited to Charles County because the wetlands sought to be protected by Chapter 792 are located in Charles County. Chapter 792 is a valid public local law and is not in violation of Article III, sec. 33 of the Maryland Constitution.

### (4)

Potomac Company argues that as a statute imposing criminal sanctions for violations, the terms of Chapter 792 are unconstitutionally vague and indefinite. This argument is rejected.

The standard established by the Supreme Court in *U. S. v. Harriss,* 347 U. S. 612, 617-618, 98 L. Ed. 989, 996-997, 74 S. Ct. 808 (1954) is: "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." The Court goes on to say that if the general class of offenses to which the statute is directed is not plainly within its terms but can be made constitutionally definite by a reasonable construction of the statute, the Court is under a duty to give the statute that construction. In *McGowan v. Md., supra,* page 400, the Supreme Court declared "people of ordinary intelligence" to be those in the position of the challenging parties applying a reasonable investigation or ordinary commercial knowledge.

Potomac Company limits its challenge to the use of the word "marshlands" in Chapter 792, arguing that "marshlands" has not been used in any Maryland statute except Chapter 792. However, "marshlands" is used repeatedly without confusion in *Kerpelman v. Bd. of Pub-*

*lic Works,* 261 Md. 436, 439, 276 A. 2d 56, 58 (1971). It is not stretching the matter too far to construe the words of Chapter 792, "tidal waters or marshlands" as tidal waters or tidal marshlands, which are those lands "affected by the regular rise and fall of the tide", or "wetlands", as defined in the Wetlands Act of 1970, sec. 719 (a).

Potomac Company has been dredging sand and gravel at least since 1960. Applying the rules of *Harriss* and *McGowan,* Potomac Company is in a position to know and understand with fair notice of what lands constitute tidal marshlands. Chapter 792 is not unconstitutionally vague or indefinite. * * *."

*Decree affirmed, the appellant*
*to pay the costs.*