## J. LAURENCE MILLISON *v.* SECRETARY OF HEALTH AND MENTAL HYGIENE

[No. 1189, September Term, 1975.]

*Decided June 29, 1976.*

The cause was argued before FREDERICK J. SINGLEY, JR., Associate Judge of the Court of Appeals of Maryland, JAMES F. COUCH, JR., Associate Judge of the Seventh Judicial Circuit, and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*David M. Williams* for appellant —cross appellee.

*Randall M. Lutz, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee—cross appellant.

SINGLEY, J., delivered the opinion of the Court.

From an order of the Circuit Court for St. Mary's County, both J. Laurence Millison and Maryland's Secretary of Health and Mental Hygiene (the Secretary) have appealed: Millison, from that part of the order which enjoins the sale or conveyance of lots in the Tarkill Subdivision without the prior approval of the Secretary; the Secretary, from that part of the order which declares that the Tarkill Subdivision is not subject to "Regulations Governing Water Supply and Sewerage Systems in the Subdivision of Land," promulgated by the Secretary, and further declares the subdivision plat of Tarkill Subdivision, recorded among the Land Records of St. Mary's County to be valid. We shall reverse that part of the order which enjoined the sale or conveyance of the lots and modify that part of the order which granted declaratory relief.

The origins of this litigation go back to May, 1966 when Millison took title to a tract of some 181 acres in the Second Election District of St. Mary's County. In 1964, a part of the land which Millison later purchased had been subdivided into 32 lots, and the subdivision plan had been approved by the then County Health Officer. Three of these lots appear to have been sold prior to the conveyance to Millison. On 22 June 1970, apparently at Millison's instance, the plan was reapproved by the same official. The subdivison plat was not

recorded, however, among the St. Mary's County land records until 7 June 1974.

On 1 February 1972, the Maryland State Department of Health and Mental Hygiene had adopted Regulations 10.03.28, "Regulations Governing Water Supply and Sewerage Systems in the Subdivision of Land," effective 3 March 1972, a comprehensive scheme which was designed to insure that acceptable provision would be made for water supply and sewage disposal in subdivisions, under the direction of the Secretary.

Regulation 10.03.28.07 contained a saving clause:

> "Any Preliminary Plan or Record Plat of a subdivision which has been submitted to the Approving Authority prior to the date of adoption shall not be required to comply with these regulations, if final approval and recordation, where required by law, is completed no later than six months from the date of adoption."

As we noted earlier, Millison recorded the Tarkill Subdivision plat on 7 June 1974. In October, 1974, the Secretary, alleging that Millison was proposing to sell lots in the subdivision, brought an action for declaratory and injunctive relief against Millison in the Circuit Court for St. Mary's County. From an order of that court enjoining the sale or conveyance of lots in the Tarkill Subdivision without the prior approval of the Secretary, Millison appealed. From that portion of the order which declared that the Tarkill Subdivision was not subject to Regulations 10.03.28.02J and 10.03.28.07 and that the subdivision plat was valid, the Secretary appealed.

Millison advances three reasons why the injunction should be vacated: (i) the trial court erred in permitting Mr. Walter Raum and Dr. William Marek to testify as experts; (ii) the trial court erred in entering an order enjoining the sale or conveyance of the lots; (iii) Regulations 10.03.28 arbitrarily deprived Millison of the use of his property without due process of law.

(i)

The trial court permitted Mr. Walter E. Raum and Dr. William Marek to testify as experts. Raum, who had been employed by the St. Mary's County Health Department for 15 years, had been its director of environmental hygiene since 1968. He held a bachelor of science degree in agronomy from the University of Maryland and a master's degree in environmental science from the Johns Hopkins University.

Dr. Marek, who had been county health officer and deputy state health officer for three years, testified that he was a graduate of the University of Maryland, with a bachelor of science degree in microbiology; of the University of Maryland Medical School and of the Johns Hopkins University School of Hygiene and Public Health, where he received a master's degree in public health.

We discern no error here. The qualifications of an expert witness are a matter for the trial court, and unless the ruling is clearly erroneous or a clear abuse of discretion, it will not be reversed on appeal, *Spence v. Wiles*, 255 Md. 98, 102-03, 257 A. 2d 164, 166-67 (1969); *Nizer v. Phelps*, 252 Md. 185, 249 A. 2d 112 (1969); *Continental Ins. Co. v. Kouwenhoven*, 242 Md. 115, 218 A. 2d 11 (1966); *Yudkin v. State*, 229 Md. 223, 182 A. 2d 798 (1962). No challenge to the experts' qualifications was advanced at trial, and we see no error or abuse of discretion here.

Raum testified that he had made about 15 test borings at Tarkill in 1969, and had visited the site again about two years prior to August of 1975. He was then permitted to testify from memory over objection as to soil types, topography and percolation, and to express an opinion that the soil was not suitable for the installation of a subsurface septic system, because such a system would probably fail during periods of wet weather.

Dr. Marek, who had visited the property on one occasion with Mr. Raum, was permitted to testify over objection that he concurred with Mr. Raum's opinion that potential health hazards would result from the use of subsurface systems on the Tarkill lots.

We grant that this testimony, which was not rebutted, could have been more comprehensive and precise. We think, however, that it met the test set out in *State Dept. of Health v. Walker*, 238 Md. 512, 520, 209 A. 2d 555, 559-60 (1965):

"This case presents a basic question of evidence, i.e., upon what conditions and under what circumstances may a witness deemed to be an expert, express an opinion in the field of his expertise. This Court has dealt many times with expert and opinion testimony. An expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert. *Doyle v. Rody*, 180 Md. 471, 25 A. 2d 457 [1942]. The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown. *State, Use of Stickley v. Critzer*, 230 Md. 286, 186 A. 2d 586 [1962], and cases cited therein; *Hammaker v. Schleigh*, 157 Md. 652, 147 Atl. 790 [1929]. The opinion of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess. *Marshall v. Sellers*, 188 Md. 508, 53 A. 2d 5 [1947]."

Indeed, it requires a minimum of field work to support an expert's opinion that a subsurface sewage disposal system proposed would not be acceptable, from a public health standpoint, in low-lying lots located in a tidal area where the water table is near the surface and subsoil conditions are not

conducive to proper percolation, the result being that ground water would become contaminated.

### (ii)

Here, Millison contends that the injunction issued by the trial court was overly broad because the sale or conveyance of a lot, standing alone, does not create a health hazard which may be abated by an injunction issued under Maryland Code (1957, 1971 Repl. Vol.) Art. 43, § 2. It is only when the lot owner proposes to construct an underground septic system for the disposal of sewage that injunctive relief of the sort fashioned by the trial court would be appropriate, *Hebron Savings Bank v. City of Salisbury*, 259 Md. 294, 300, 269 A. 2d 597, 600 (1970); *Board of Health v. Crew*, 212 Md. 229, 238-39, 129 A. 2d 115, 119-120 (1957), for not until that time would there be a threatened health hazard. In any event, the result which we reach obviates the need for injunctive relief.

### (iii)

Millison next argues that the Secretary's regulations arbitrarily and illegally deprive him of the reasonable use of his property without due process of law.

Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.) Art. 43, § 1F d grants a broad statutory mandate to the Secretary:

> "To formulate and promulgate, with and on the advice of the commissioners of health and mental hygiene, rules, regulations, and standards for the purpose of promoting and guiding the development of the environmental, physical and mental hygiene services of the State and its subdivisions. To enforce rules and regulations promulgated by the Department of Health and Mental Hygiene."

See also Code (1957, 1971 Repl. Vol.) Art. 43, §§ 388 and 396 which delineate the powers of the State Board (now the Department) of Health and Mental Hygiene as regards water pollution and sewage disposal.

Regulations issued by the Secretary are but another

aspect of the exercise of the police power, *Salisbury Beauty Schools v. State Bd. of Cosmetologists*, 268 Md. 32, 300 A. 2d 367 (1973).

As Judge Hammond, for the Court of Appeals, noted in *Allied American Mut. Fire Ins. Co. v. Commissioner of Motor Vehicles*, 219 Md. 607, 616-17, 150 A. 2d 421, 427 (1959):

> "Essentially the police power of a state is no more than the power to govern. *Baltimore Gas Co. v. State Roads Comm.*, 214 Md. 266, 279 [,134 A. 2d 312, 318 (1957)]; *Capital Transit Co. v. Bosley*, 191 Md. 502, 514 [,62 A. 2d 267, 273 (1948)]. The power justifies regulations designed to promote the public convenience or the general prosperity, as well as those to promote public safety, health and morals, since it extends to the satisfying of great public needs and the promotion of the general welfare. *Maryland Coal and Realty Co. v. Bureau of Mines*, 193 Md. 627 [, 69 A. 2d 471 (1949)]; *Bacon v. Walker*, 204 U. S. 311, 51 L. Ed. 499 [1907]; *C. B. & Q. Railway v. Drainage Comm'rs*, 200 U. S. 561, 50 L. Ed. 596 [1906]; *Nebbia v. New York*, 291 U. S. 502, 78 L. Ed. 940 [1934]. The current thinking of the Supreme Court would seem to be illustrated by *Williamson v. Lee Optical Co.*, 348 U. S. 483, 99 L. Ed. 563 [1955], where the Court, in effect, held that state legislation, imposing regulations under the police power to correct an evil at hand, is valid if it might have been thought by the legislature that the particular measure was a rational way to correct it.
>
> "The due process clause does not, any more than the contract clause, inhibit a state from insisting that all contract and property rights are held subject to the fair exercise of the police power. *Atlantic Coast Line v. Goldsboro*, 232 U. S. 548, 558, 58 L. Ed. 721 [1914]. The exercise of the power is fair when the purpose is a proper public one and the means employed bear a real and substantial relation to the end sought and are not arbitrary or

oppressive. The Supreme Court said in *Erie R. R. Co. v. Williams*, 233 U. S. 685, 700, 58 L. Ed. 1155 [1914]: 'It is hardly necessary to say that cost and inconvenience (different words, probably, for the same thing) would have to be very great before they could become an element in the consideration of the right of a State to exert its reserved power or its police power.' There are many holdings that enforcement of uncompensated obedience to a regulation passed in the legitimate exercise of the police power is not a taking without payment of just compensation. *N. O. Public Service v. New Orleans*, 281 U. S. 682, 687, 74 L. Ed. 1115 [1930]; *Chicago, Burlington & Q. R. Co. v. Chicago*, 166 U. S. 226, 255, 41 L. Ed. 979 [1897]; *Noble State Bank v. Haskell*, 219 U. S. 104, 110, 55 L. Ed. 112 [1911]; *Capital Transit Co. v. Bosley, supra*, at page 514 of 191 Md."

See also the discussion in *Potomac Sand & Gravel Co. v. Governor*, 266 Md. 358, 367-75, 293 A. 2d 241, 246-50 (1972).

Another aspect of the exercise of the police power is found in zoning ordinances and regulations, where the cases hold that a property owner has no vested right to a use of his property, permitted at the time of acquisition and later prohibited or restricted unless there is a change in position, made in reliance on the permitted use, *Steuart Petroleum Co. v. Board*, 276 Md. 435, 442-44, 446-47, 347 A. 2d 854, 859-60, 861 (1975) and cases there cited.

Millison would have us hold that he changed his position when he purchased the tract, relying on the fact that lots in the subdivision could be sold as lots. We regard this argument as illusory, and no more available to him than to a purchaser of land zoned for business use, which is rezoned for residential use before it is devoted to business purposes, *Serio v. City of Baltimore*, 208 Md. 545, 119 A. 2d 387 (1956); *Quinn v. County Comm'rs*, 20 Md. App. 413, 316 A. 2d 535 (1974); *Roberts v. Grant*, 20 Md. App. 247, 315 A. 2d 103 (1974).

In his cross appeal, the Secretary argues that the lower court erred in holding that Regulation 10.03.28.07, the saving clause, was not applicable to the Tarkill Subdivision. Millison contends that 10.03.28.07 was to have only prospective, not retrospective operation, an argument which we think serves to obscure the issue. The saving clause was prospective in operation. It was designed to validate approval previously given to subdivision plans which owners had failed to record, provided that recordation was accomplished within six months of the effective date of the regulations, or by 31 July 1972. When Millison failed to do this, the approval which he had obtained in 1970 expired, and the subdivision plat which he recorded in 1974 should not have been accepted for recording because the approval required by Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.) Art. 43, § 387C (d) 3 had expired:

> "No State or local authority empowered to grant building permits or to approve subdivision plans, maps, or plats, shall grant any such permit or record or approve any such plan, map, or plat which provides for individual or community water supply or sewerage systems, or for solid waste acceptance facilities, unless such systems or facilities are found to be in conformance with the county plan, amendments or revisions thereof."

For the reasons stated, we shall reverse that part of the order of the trial court which granted the injunction and modify and affirm as modified that part of the order which granted declaratory relief as follows:

> "Accordingly, it is this 15th day of October, 1975 by the Circuit Court for St. Mary's County, Maryland,
>
> "ORDERED and DECLARED that regulation numbered 10.03.28.07 of 'Regulations Governing Water Supply and Sewerage Systems in the Subdivision of Land' is applicable to the plat of Tarkill Subdivision which is the subject of these proceedings and it is further,

"ADJUDGED, ORDERED and DECREED that the plat of Tarkill Subdivision as recorded among the plat book records for St. Mary's County, Maryland in plat book DBK 11 Folio 62 is null and void and shall be expunged from said records."

*Order reversed in part and modified in part, and as modified affirmed; costs on appeal and below to be paid by appellant here and defendant below.*